**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| EMILY SMITH and | * | |
| JOSEPH SMITH | * | |
| Plaintiffs | * | |
| | * | |
| V. | * | |
| | * | NO: 4:14CV00761  SWW |
| CHAD CONDER, JOHN FENTON, and | * | |
| the CITY OF PANGBURN, | * | |
| ARKANSAS | * | |
| Defendants | * | |

**OPINION and ORDER**

Emily Smith ("Mrs. Smith") and Joseph Smith ("Mr. Smith") bring this action under

federal civil rights laws, 42 U.S.C. §§ 1983, 1985, and 1986, charging that the City of Pangburn

("City"), Pangburn police officer John Fenton ("Fenton"), and Arkansas State Trooper Chad

Conder ("Conder") violated their constitutional rights.  Plaintiffs sue Fenton and Conder in their

individual and official capacities, and they bring supplemental state-law claims for felony battery

and violation of the Arkansas Civil Rights Act.  Before the Court is a motion for summary

judgment by the City and Fenton [ECF Nos. 29, 30, 31], Plaintiffs' response in opposition [ECF

Nos. 40, 41, 42, 43], and the movants' reply [ECF No. 45].  After careful consideration, and for

reasons that follow, the motion is granted, and all claims against the City and Fenton are

dismissed with prejudice.  Additionally, pursuant to Federal Rule of Civil Procedure 56(f),[1] the

---

[1]Rule 56(f) provides:

> After giving notice and a reasonable time to respond, the court may:
> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying for the parties
> material facts that may not be genuinely in dispute.

Court gives notice that unless an objection is filed within fourteen (14) days from the entry date of this order, the Court will *sua sponte* grant summary judgment in favor of Defendant Conder and dismiss this action in its entirety.  The jury trial in this matter, scheduled to begin on January 30, 2017, is cancelled and will be reset only if necessary.

## I.

Summary judgment is proper if the evidence, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 371, 322 (1986).  When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 at 322-23.  A factual dispute is genuine if the evidence could cause a reasonable jury to enter a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008)(citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."  *Celotex*, 477 U.S. at 331.

## II.

Unless otherwise stated, the following facts are undisputed.[2]  On January 2, 2012, Mrs.

---

Fed. R. Civ. P. 56(f).

[2]Local Rule 56.1 provides that any party moving for summary judgment "shall annex to the notice of motion a separate, short and concise statement of material facts as to which it contends there is no genuine dispute to be tried."  Local Rule 56.1(a).  Likewise, a nonmoving party that opposes the motion, "shall file, in addition to any response and brief, a separate short

Smith, a resident of Pangburn, spent the day in Searcy at friend Leslie Wilson's house, helping Wilson pack for a move.  Mrs. Smith consumed beer at Wilson's house.[3]  That evening, at approximately 9:00 p.m., Mrs. Smith drove her vehicle back to Pangburn, approximately fifteen miles northwest of Searcy, with Mr. Smith  driving behind her in a separate vehicle.  At approximately 9:30 p.m., after Mrs. Smith had turned onto Highway 124, she swerved off the road and hit a road sign, which caused damage to the sign and her vehicle.  Mrs. Smith then continued home, where she consumed more alcohol and went to bed.

At approximately 10:30 p.m., Pangburn police officer Fenton received a dispatch call, stating that a witness had observed a white Mercury Mountaineer SUV (the "SUV") being driven recklessly and striking a sign on Highway 124.  According to Fenton's written police report, dispatch services told him that deputies had located a vehicle matching the SUV's description and license number at a particular residence, and Fenton went that location and confirmed the presence of the SUV.  Fenton followed instructions to stand by at the residence and await the arrival of an Arkansas State Trooper.

Arkansas State Trooper Conder received a call at approximately 9:40 p.m., advising him

---

and concise statement of the material facts as to which it contends a genuine dispute exists to be tried."  Local Rule 56.1(b).  "All material facts set forth in the statement filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . . " Local Rule 56.1(c).

[3]In response to Separate Defendants' statement of facts, citing Emily Smith's deposition testimony, Plaintiffs state: "Ms. Smith testified in her sworn deposition that she had three beers while at the home of her friend . . . and that those were consumed in the afternoon well before she drove home."  ECF No. 39, at 2.  The Court has searched the record and is unable to locate the foregoing testimony.  Plaintiffs cite page 16 of Smith's deposition transcript, but that page is not included in the record.

that the driver of a white SUV hit a road sign on Highway 124 and left the scene.  Conder also received a call from the Pangburn Chief of Police, who asked him to go to a certain residence where the SUV had been located.  When Conder arrived at the scene, Fenton and another Pangburn officer were standing by.  Conder observed the SUV in an open garage, he knocked at the door, and Mr. Smith appeared.   In response to Conder's questions, Mr. Smith stated that his wife had been in Searcy and had driven the SUV.  Conder requested that Mr. Smith come outside and talk, but he declined the invitation and slammed the door shut.  A few minutes later, Mrs. Smith came to the door, and she granted Conder's request to step outside and talk to him.

A dash cam on Conder's patrol car, which faced the Smiths' open garage, recorded the events that transpired after Mrs. Smith stepped outside  her residence.[4]  Mrs. Smith, in pajamas and a robe, and Conder stood between the front of Conder's patrol car and the open entrance of the garage, which contained the SUV and a truck.  Mrs. Smith submitted to a preliminary breathalyser test, which registered .142.

Next, Conder read Mrs. Smith her *Miranda* rights, which she stated she understood. Meanwhile, Mr. Smith had exited the house through a door in the garage, which presumably led into the house, and Conder ordered him to go back inside.  Conder advised Mr. Smith that if he were needed, Conder would knock on the door and ask him to come out.  Mr. Smith responded, "alright," and he appeared to go inside.[5]  A moment later, Conder stated, "Mr. Smith," and Mr. Smith responded, "I'm going back into the house like you told me."[6]

---

[4]ECF No. 31-4, Ex. #4 (DVD of dash cam video).

[5]ECF No. 31-4, Ex. #4 (DVD of dash cam video, begin at 01:36).

[6]*Id*.

Conder then turned to Mrs. Smith and informed her that a witness had observed her driving from Searcy to Pangburn and reported that she was "all over the road" and hit a sign. Mrs. Smith stated that her husband was behind her the entire way home, and Conder asked her to explain what happened. Conder stated:

> Here's what I want to do. Listen to me. You can either cooperate with me, and do this the easy way, or you can do this the hard way. I will call your friend, and I will find out how much you had to drink at her house. I will go all the way back. I'm up all night long. I have absolutely nothing to do. We can take this the long way, or we can take this the easy way.[7]

Mrs. Smith responded that she wanted to take it the "easy way," and she recounted that on her way home from Wilson's house, she hit a sign while swerving to miss a dog that had darted in front of her vehicle. Mrs. Smith complained that her SUV was "[expletive]-up" and that she would have to pay for the damage. She also acknowledged that she left the scene after she hit the sign but stated that she didn't know what she had hit until she got home. Smith spoke in a raised voice, she told Conder he was mean and rude, and she accused him of harassing her.

Conder asked Mrs. Smith to provide Wilson's phone number. She denied knowing the number and stated that it was stored in her phone, which was elsewhere. Mrs. Smith then volunteered: "Yes, I did drink a few beers over there but I was not so drunk that by the time that I drove all the way from Searcy that I turned off the road and hit a sign."[8] Mrs. Smith stated that she drank more alcohol after she arrived home because she was upset that she had damaged her vehicle. She asked Conder his name, and when he told her, she began laughing in a loud and

---

[7]ECF No. 34-4, Ex. #4 (DVD of dash cam video at 02:47).

[8]*Id*. (DVD of dash cam video at 04:48).

5

sarcastic manner, and said, "You remember me don't you?"[9]  Conder stated that he hadn't a clue

who Mrs. Smith was, and she responded:  "I'm sorry I guess I don't know you.  I've been home

two hours, and now you all want to mess with me.  I just want to get this over with as easily and

nicely as possible."[10]

Conder asked Mrs. Smith about the alcohol she had consumed at Wilson's house, and she

stated that she had "approximately four beers."[11]  Mrs. Smith insisted that she was not drunk

when she drove home from Searcy.  She added that she went to Wilson's house at 3:00 p.m, left

at 9:00 p.m., arrived home at 9:30 p.m., and consumed about one-third cup of rum at home.

Conder stated that he thought Mrs. Smith was lying to him and that she was drunk when she left

Wilson's house.

After a discussion about Mrs. Smith providing a written statement, and the need to

provide a truthful account of what happened, Conder instructed her to retrieve her proof of

insurance and vehicle registration from the SUV.  Smith responded, "I don't like your tone and

manner."[12]  She continued loudly:  "You're on my property and my house accusing me of all

sorts of shit--I'm telling you the truth, and you're calling me a liar."[13]  Conder again directed

Smith to retrieve her proof of insurance and registration, and Smith directed Conder to say

"please."  Conder instructed Smith a third time to retrieve documents from the vehicle.  Smith

---

[9]*Id*. (DVD of dash cam video at 05:38).

[10]*Id*. (DVD of dash cam video at 05:52).

[11]*Id*. (DVD of dash cam video at 06:39).

[12]*Id*. (DVD of dash cam video at 09:34).

[13]*Id*. (DVD of dash cam video at 09:38).

responded, "I would like you to be a little bit nicer,"[14] and she told Conder that he knew who she was from a previous incident and that he was rude.

Multiple times, Smith disregarded Conder's instructions to retrieve insurance and registration documents, and she continued, in a raised voice, to accuse him of knowing who she was. Conder then walked past Smith, put his flashlight in the bed of the truck parked beside the SUV, and he started walking to the passenger's side of the SUV. Smith moved toward Conder and pushed the front of her body into his, in an apparent effort to stop him from reaching the SUV.

While Smith was attempting to push Conder, who was much larger than she, Conder grabbed her left elbow and arm. Smith then made a fist with her right hand, and attempted to strike Conder in his chest. Fenton, who had been standing nearby observing, intervened and took Smith's right arm, while Conder held her left. Smith struggled with the officers and tried to pull away, but Fenton and Conder continued to hold her arms, and directed her to the front of a patrol car. Smith then placed her left foot on the front of the patrol car, her body elevated, and she landed face first on the hood of the vehicle. Fenton and Conder continued to hold Smith's arms, and she continued to struggle, while her torso and head rested on the patrol car. Fenton and Conder placed Smith's arms behind her, handcuffed her, and placed her in the back of the patrol car.

Conder went to the SUV and opened the passenger door, and closed it seconds later, with nothing in his hands. Conder then asked Mr. Smith to step outside and provide him the registration and proof in insurance, and Mr. Smith complied. Conder interviewed Mr. Smith

---

[14]*Id*. (DVD of dash cam video at 10:09).

about the day's events, while Fenton and another officer stood by.  Among other things, Mr. Smith stated that neither he nor Mrs. Smith realized she had hit a road sign until they arrived home and noticed that the SUV had been damaged.  He also stated that Mrs. Smith consumed both beer and rum after she got home.  Mr. Smith asked whether his wife could put on regular clothes before she went to jail, and Conder responded, "They'll dress her out down there."[15] Mrs. Smith can be heard saying: "This is the same [expletive] asshole that pulled me over (inaudible),"  and Mr. Smith stated, "Yeah, I know it.  Retaliation, right?"[16]

Conder transported Mrs. Smith to the White County Jail.  En route, Conder passed a damaged road sign on Highway 124, which was readily visible, and he captured the sign on the dash cam recording.[17]  Mrs. Smith became extremely talkative during the drive, and she berated Conder for being a mean person and ticketing her a few years earlier, when she drove around a "road closed" sign--an incident that Conder stated he did not remember.[18]  Mrs. Smith also complained that she injured her lip when she landed on the hood of the patrol car. [19]  Conder then asked Mrs. Smith if she wanted to go to a hospital for medical treatment.  Mrs. Smith initially stated, "Sure," then said that she didn't need to go to the hospital.[20]   During the entire drive to the jail, Conder spoke to Mrs. Smith in a calm manner.

---

[15]*Id*. (DVD of dash cam video at 19:38).

[16]*Id*. (DVD of dash cam video, begin at 19:43).

[17]*Id*. (DVD of dash cam video, begin at 24:15).

[18]*Id*. (DVD of dash cam video, begin at 28:52).

[19]*Id*. (DVD of dash cam video, begin at 32:59).

[20]*Id*. (DVD of dash cam video at 33:58).

At the jail, Conder conducted a field sobriety test, he read Mrs. Smith information about her rights and duties regarding a chemical alcohol test, and she signed a related form. Mrs. Smith appears physically well in the video footage, but she complained of a busted lip and an injured knee. Conder again asked Smith whether she wanted medical attention, and she responded: "I want you to say I'm sorry for one time in your life."[21]  Conder asked Mrs. Smith if she understood her rights regarding a certified chemical alcohol test. Mrs. Smith smiled and responded:  "I'm really smart, I'm just a smart ass, you know, and I don't like you so I'm going to give you a hard time."[22]

### III.

Plaintiffs claim that each defendant violated their rights to due process and to be free from illegal search and seizure. Mrs. Smith additionally claims that Conder and Fenton used excessive force against her, committed felony assault in violation of state law, and  subjected her to cruel and unusual punishment. Fenton and the City move for summary judgment on all claims against them, asserting that Fenton is entitled to qualified immunity and that the undisputed facts show that there are no genuine issues for trial.

### **Qualified Immunity**

Qualified immunity shields government employees acting within the scope of their duties from suit against them in their individual capacity so long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would know." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Determining whether Fenton is entitled to

---

[21]*Id*. (DVD of dash cam video, begin at 58:42).

[22]*Id*. (DVD of dash cam video, begin at 1:00:28).

qualified immunity involves a two-step inquiry.  The first question is whether, taken in the light most favorable to Plaintiffs, the facts show that Fenton's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).  If the answer is no, the inquiry is over because Fenton is entitled to qualified immunity.  If the answer is yes, the second question is whether the constitutional right at issue was clearly established. *Id*. For reason that follow, the Court finds that Fenton is entitled to qualified immunity with respect to each of Plaintiffs' claims asserting a constitutional violation.[23]

***Illegal Search***.  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend.  IV. The Fourth Amendment's guarantee against unreasonable search and seizure extends to the curtilage[24] surrounding a home, *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134 (1987), but intrusion into this area is permitted if reasonably necessary to further a legitimate law enforcement purpose.  *See United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006).  Further,  "courts have recognized no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors–such as driveways, walkways, or similar passageways." *United States v.*

---

[23]Plaintiffs claim violations of both the Arkansas and United States Constitutions, and they do not contend that the Arkansas Constitution provides a different level of protection for the alleged violations than that provided by federal law.  Additionally, the Arkansas Supreme Court has held that the legal principles that govern questions of qualified immunity in federal § 1983 claims apply to claims brought under the Arkansas Civil Rights Act. *See Robinson v. Langdon*, 333 Ark. 662, 970 S.W.2d 292, 296 (1998).

[24]"'Curtilage' means 'the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life.'" *United States v. Weston*, 443 F.3d 661, 666-67 (8th Cir. 2006)(quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735 (1984)).

*Reed*, 733 F.2d 492, 501 (8th Cir. 1984)(citations omitted).

Here, Fenton committed no Fourth Amendment violation when he was present outside the Smith's home for the purpose of locating a vehicle that was the subject of a reckless driving report.  And from that permissible vantage point, he was permitted to look into the open garage to check the SUV's license number.  The record is void of any evidence that Fenton took any additional action in the way of a search, and the Court finds no issues for trial with respect to Plaintiffs' claim that he committed an illegal search.

*Illegal Seizure*.  A seizure of the person occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).  Here, when officers determined that the license plate on the SUV matched the one that a witness had reported, Conder employed a reasonable investigative tactic, commonly known as a "knock and talk."  Mr. Smith answered and talked to him for a time, but then he shut the door, demonstrating that he believed that he was free to leave.

Mr. Smith argues that the defendants effected an illegal seizure when Conder ordered him to stay in the house, making him a prisoner in his own home.  Even assuming that Conder effected a "seizure of the person" by momentarily restricting Smith's movement to the confines of his home, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of an investigation.  *See United States v. Jones*, 759 F.2d 633, 638 (8th Cir. 1985).  More important for purposes of the present motion, Fenton, the movant seeking summary judgment, took no part in ordering Smith to stay inside.

With respect to Mrs. Smith, the undisputed facts and events captured on the dash cam video demonstrate that no seizure occurred until Conder grabbed her left arm, when she attempted to push or shove him away from the SUV.  Only when Mrs. Smith made a fist with her right hand and attempted to punch Conder, did Fenton intervene by restraining Mrs. Smith's right arm.  Under the circumstances, Fenton's conduct in helping to restrain Mrs. Smith was reasonable and did not amount to an illegal seizure.

The next question is whether Fenton's conduct in arresting Mrs. Smith by helping Conder handcuff her and place her in Conder's patrol car amounted to an illegal seizure.  "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'"  *Gilmore v. City of Minneapolis*, 837 F.3d 827, 832 (8th Cir. 2016)(quoting *Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011)(quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).   Further, an officer has probable cause when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.  *Id.*  "If an officer arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists 'if the mistake is objectively reasonable.'"  *Id.* (quoting *Borgman,* 646 F.3d at 523)(quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

Conder and Fenton did not observe Smith operating her vehicle, but during the course of Conder's permissible questioning, Smith acknowledged that she had consumed beer in Searcy and had damaged a road sign on her way home.  That information, supplemented by witness accounts that the SUV had been driven recklessly, and the result of Smith's preliminary

breathalyser test, gave the officers probable cause to arrest Smith for driving while intoxicated in violation of Arkansas law.  *See* Ark. Code Ann. § 5-65-103(making it unlawful to operate a motor vehicle if at that time the alcohol concentration in the person's breath was eight hundredths (0.08) or more).

Plaintiffs argue that under the facts of this case, there was "no plausible exception to the warrant requirement over a potential Class C misdemeanor and traffic violation."[25]  Neither the Supreme Court nor the Eighth Circuit has held that the Fourth Amendment invariably requires a warrant for a misdemeanor arrest if the crime is not committed in the presence of the arresting officer.  Accordingly, the Eighth Circuit has held that "the law regarding warrantless misdemeanor arrests for offenses committed outside the presence of the arresting officer is not clearly established under the Fourth Amendment . . . . " *Gilmore v. City of Minneapolis*, 837 F.3d 827, 834 (8th Cir. 2016).[26] In sum, the Court finds that Fenton had probable cause to believe that Smith had committed the crime of driving while intoxicated and that he is entitled to qualified immunity on Mrs. Smith's Fourth Amendment, illegal seizure claim.

*Excessive Force.*  All claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.[27]  *Graham v. Conner*, 490 U.S.

---

[25]ECF No. 41.

[26]The Court notes that the fact that the arrest took place on Smith's property rather than the scene of the accident did not preclude a warrantless arrest.  In *United States v. Santana*, 427 U.S. 38, 96 S. Ct. 2406 (1976), the Supreme Court observed that under the common law of property, the threshold of one's dwelling is private, but in the context of the Fourth Amendment, the area is public.

[27]Plaintiffs make passing reference to the Due Process Clause.  However, "[w]here a particular amendment provides an explicit textual source of constitutional protection against a

386, 395, 109 S. Ct. 1865 (1989).  The test is whether the amount of force used was objectively

reasonable under the particular circumstances that confronted law enforcement officers. *See*

*Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir.2004)(quoting *Greiner v. City of Champlin*, 27

F.3d 1346, 1354 (8th Cir.1994)).   A court may also consider the results of the use of force in

determining whether a defendant used excessive force.  *See Foster v. Metropolitan Airports*

*Com'n*, 914 F.2d 1076, 1082 (8th Cir. 1990)(finding that allegations regarding pain were

insufficient and plaintiff needed some evidence of "a more permanent injury" caused by the use

of excessive force).

Viewing the video recorded from Conder's patrol car, it is clear that Fenton and Conder

retrained Mrs. Smith because she became combative and attempted to hit Conder.  It is also clear

that Mrs. Smith's own conduct, *i.e.*, placing her foot on the front of the patrol car and pushing

off, caused her hard landing on the hood of the vehicle.  Conder and Fenton merely led her in the

direction of the patrol car.  Without question, the undisputed facts show that Fenton did not

subject Mrs. Smith to excessive force.

***Cruel and Unusual Punishment***.  Mrs. Smith claims that Conder's refusal to allow her

to change clothes before he transported her to jail amounted to cruel and unusual punishment.

Because Mrs. Smith was a pretrial detainee at the time of the complained-of conduct, her claim

---

particular sort of government behavior, that Amendment, not the more generalized notion of
substantive due process, must be the guide for analyzing these claims." *Graham v. Connor*, 490
U.S. 386, 395 (1989)**.  When an officer allegedly uses excessive force in the course an arrest
or seizure, the text of the Fourth Amendment, which addresses unreasonable searches and
seizures, provides the pertinent source of constitutional protection.** *Id.*  **If a plaintiff
cannot prevail under the Fourth Amendment's standards,  "it is a certainty he cannot win
it under the seemingly more burdensome, and clearly no less burdensome, [shock-the-
conscience] standard that must be met to establish a Fourteenth Amendment substantive
due process claim."** *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000)**.**

is analyzed under the Fourteenth Amendment Due Process Clause, rather than the Eighth

Amendment's prohibition of cruel and unusual punishment. *See Morris v. Zefferi*, 601 F.3d 805,

809 (8th Cir. 2010)(citing *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003)). In

considering whether the conditions of pretrial detention are unconstitutionally punitive, the

Court reviews the totality of the circumstances of a pretrial detainee's confinement. *Id*.

In addition to her complaint that Conder did not permit her to change clothes, Mrs. Smith

reports that when she was present at the county jail, "she was even made to give up her robe and

she was exposed to the many men and women in the jail with only a t-shirt or sleeping gear and

no undergarments."[28]  Mrs. Smith's grievance over what she wore at the jail simply does not rise

to the level of punishment or a deprivation of a fundamental liberty interest. *See Smith v.

Copeland*, 87 F.3d 265, 267 (8th Cir.1996)(finding no constitutional violation when a jail

detainee was placed in solitary confinement without clothing, bedding, or blankets for four

days). Furthermore, she does not claim that Fenton had any role in events that took place at the

jail.

### Felony Battery

Arkansas's crime victims civil liability statute, Ark. Code Ann. § 16–118–107, provides a

civil cause of action to "[a]ny person injured or damaged by reason of conduct of another person

that would constitute a felony under Arkansas law." Plaintiffs offer no allegations or evidence to

support the claim that Fenton or Conder committed a felony battery in violation of Arkansas

law,[29] and the Court finds that the movants are entitled to summary judgment on this claim.

---

[28]ECF No. 41, at 6-7.

[29]  The pertinent portion of Arkansas's second-degree battery statute provides that a
person commits the crime, a Class D felony, if:

## Civil Conspiracy

With the complaint, Plaintiffs purport to bring claims under 42 U.S.C. §§ 1985, for a civil rights conspiracy, and 42 U.S.C. § 1986, for failure to prevent a civil rights conspiracy.   A claim under § 1986 must be predicated upon a valid claim under § 1985.  *See Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002).   In order to show a civil rights conspiracy under § 1985(3), the Smiths must prove: (1) the defendants conspired, (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) that they or their property were injured, or they were deprived of exercising any right or privilege of a citizen of the United States. *See Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir.1996).  The record is void of any facts indicating that defendants reached an understanding to violate the Smiths' civil rights, and the Smiths fail to state a claim for civil conspiracy.

## Municipal Liability

It is well settled that a plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non-policymaking employees of the municipality "as to constitute a 'custom or usage' with the force of law."  *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998)(quoting  *Monell v. Dep't of Social Servs. of the City of New York,* 436

---

(1) With the purpose of causing physical injury to another person, he causes serious physical injury to any person;
(2) With the purpose of causing physical injury to another person, he causes physical injury to any person by means of a deadly weapon other than a firearm;
(3) He recklessly causes serious physical injury to another person by means of a deadly weapon . . . .

Ark. Code Ann. § 5–13–202(a).

16

U.S. 658, 691 (1978)).

"Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." *Id.* (quoting *Jane Doe A. v. Special Sch. Dist,* 901 F.2d at 642, 645 (8th Cir. 1990).   Alternatively, "custom or usage" is demonstrated by: (1) the existence of continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, *i.e.,* proof that the custom was the moving force behind the constitutional violation.  *Id.* (quoting *Jane Doe A.*, 901 F.2d at 646).

Here, the Smiths fail to allege facts or provide any evidence sufficient to support a claim for municipal liability.  Furthermore, when alleged conduct does not deprive a plaintiff of a federally protected right, which is the case here, an attendant §1983 claim against a municipal employer for causing the conduct must fail.  *See Olinger v. Larson*, 134 F.3d 1362, 1367 (8th Cir. 1998) ("In light of our ruling that Detective Larson and Chief Satterlee did not violate Olinger's fourth amendment rights, Olinger's claims against the City . . . must also fail.");  *Abbot v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) ("The City cannot be liable . . . whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim.");  *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993) (holding that because defendant officers possessed probable cause to obtain an arrest warrant, no basis for liability existed for the city or county).  Accordingly, no issues for trial exist as to claims against

the City.

## Notice Regarding Remaining Claims

Although defendant Conder has not moved for summary judgment separately or joined the motion by Fenton and the City, the Court finds it proper to raise several dispositive issues *sua sponte*. First, the sovereign immunity of the States recognized in the Eleventh Amendment bars the Smith's official-capacity claims for damages against Conder.[30] Damages may not be recovered against the State, absent waiver or abrogation of sovereign immunity, and none has occurred here. *See Treleven v. University of Minnesota*, 73 F.3d 816, 818 (8th Cir. 1996)(quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347(1945)).

Second, Plaintiffs' individual-capacity claims against Conder match those they bring against Fenton. Having determined that Plaintiffs cannot establish a constitutional violation and that no genuine issues of fact exist as to any claim presented, the Court finds that the individual-capacity claims against Conder should be dismissed. Federal district courts have power to grant summary judgment *sua sponte* when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Interco Inc. v. National Sur. Corp.*, 900 F.2d 1264, 1269 (8th Cir.1990). Pursuant to Federal Rule of Civil Procedure 56(f), the Court hereby gives notice that all claims against Defendant Conder will be dismissed within fourteen (14) days if no objection is filed.

## IV.

For the foregoing reasons, IT IS HEREBY ORDERED THAT the motion for summary

---

[30]Because sovereign immunity is a threshold jurisdictional matter, it may be raised *sua sponte* by the Court.

judgment filed by Separate Defendants John Fenton and the City of Pangburn [ECF No. 29] is GRANTED, and all claims against these defendants are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that notice is hereby issued, pursuant to Federal Rule of Civil Procedure 56(f), that the Court will *sua sponte* grant summary judgment in favor of Separate Defendant Chad Conder if no objection is filed within fourteen (14) days.

IT IS FURTHER ORDERED that trial in this matter, currently set for January 30, 2017, is CANCELLED and will be reset if necessary.

IT IS SO ORDERED THIS 21st DAY OF DECEMBER, 2016.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE